IN THE U.S. DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

MURIEL REYNOLDS, In Her
Individual Capacity and as Administrator
of the Estate of Nathaniel Reynolds,
Deceased,
       Plaintiff,

vs.

BRIAN OWENS, Individually and as
Commissioner, Georgia Department of
Corrections; TIMOTHY WARD,
Individually and as Assistant
Commissioner, Georgia Department of
Corrections; CLAY TATUM,
Individually and as Former Warden,
Hays State Prison; SHAY HATCHER,
Individually and as Former Deputy
Warden, Hays State Prison; BETTY
BAILEY-DEAN, Individually and as
Former Deputy Warden, Hays State
Prison; TIMOTHY CLARK,
Individually and as Former Captain,
Hays State Prison; NICHOLAS
SOUTHER, Individually and as a former
Corrections Officer at Hays State Prison;
and STEFAN G. HOGLUND,
Individually and as a Corrections Officer
at Hays State Prison;
       Defendants.
_____

Civil Action

File No.:

Jury Trial Demanded

# I. INTRODUCTION

1.      Plaintiff Muriel Reynolds, individually and in her capacity as Administrator of the Estate of Nathaniel Reynolds ("Nate"), brings this civil rights action pursuant to 42 U.S.C. § 1983 arising from the death of her husband, Nathaniel Reynolds, on Tuesday, January 18, 2013. Nate was a prisoner at Hays State Prison ("Hays"). On January 18, 2013, unarmed prison officials escorted Nate directly into an area where Leonardo Ramos Rodrigues, an inmate with whom Nate had recently fought, was walking unsupervised. Rodrigues was armed, as are most inmates at Hays. Joined by another inmate, Rodrigues immediately cornered Nate between a wall and a fence and slaughtered him by stabbing him 17 times as the unarmed corrections officers watched.

Nate's murder was the third murder of an inmate at Hays in four weeks. The murder was caused by Defendants' actions and inactions that violated Nate's clearly established constitutional rights and that converted Hays Prison into a killing field. Acting under color of law, Defendants

deprived Nate of his rights under the Constitution and laws of the United States, and forced him into his fatal, inescapable confrontation with Rodrigues.

# II. THE PARTIES

2.  Nathaniel Reynolds ("Nate") was a prisoner in the Hays State Prison in Trion, Georgia.

3.  Nate was murdered while in Hays State Prison.

4.  Plaintiff Muriel Reynolds was Nate's spouse.

5.  Plaintiff Muriel Reynolds was appointed by the Fulton County Probate Court as the Administrator of the Nate's estate.

6.  Nate also has a minor child.

7.  In accordance with Georgia law, Ms. Reynolds is asserting the claims contained in this lawsuit on behalf of herself and Nate's minor child.

8.  Brian Owens is and was at all relevant times the Commissioner of the Georgia Department of Corrections ("GDC").

9.  As Commissioner, Defendant Owens is responsible for the supervision of operations at GDC facilities.

10.    Defendant Owens is being sued in his individual capacity.

11.    Defendant Timothy Ward is and was at all relevant times the Assistant

Commissioner of the GDC.

12.    As Assistant Commissioner, Defendant Ward shares responsibility for the

supervision of operations at GDC facilities.

13.    Defendant Ward is being sued in his individual capacity.

14.    Defendant Clay Tatum was the warden at Hays State Prison at all times

relevant to this action.

15.    Defendant Tatum had final responsibility for the day-to-day operations at

Hays State Prison.

16.    Defendant Tatum is being sued in his individual capacity.

17.    Defendant Shay Hatcher was a Deputy Warden of Security at Hays State

Prison at all times relevant to this action.

18.    Defendant Hatcher shared responsibility for the day-to-day operations at

Hays State Prison.

19.    Defendant Hatcher is being sued in his individual capacity.

20.   Defendant Betty Bailey-Dean was a Deputy Warden of Care and Treatment at Hays State Prison at all times relevant to this action.

21.   Defendant Bailey-Dean shared responsibility for the day-to-day operations at Hays State Prison.

22.   Defendant Bailey-Dean is being sued in her individual capacity.

23.   Defendant Timothy Clark was a Captain at Hays State Prison at all times relevant to this action.

24.   Defendant Clark shared responsibility for the day-to-day operations at Hays State Prison.

25.   Defendant Clark is being sued in his individual capacity.

26.   Defendant Nicholas Souther was a correctional officer at Hays State Prison at all times relevant to this action.

27.   Defendant Souther was one of the officers responsible for escorting Nate from the isolation unit to the scene of Nate's murder.

28.   Defendant Souther is being sued in his individual capacity.

29.   Defendant Stefan G. Hoglund was a correctional officer at Hays State Prison at all times relevant to this action.

30.   Defendant Hoglund was one of the officers responsible for escorting Nate

from the isolation unit to the scene of Nate's murder.

31.   Defendant Hoglund is being sued in his individual capacity.

32.   The Defendants are citizens of the United States and the State of Georgia.

At all times relevant herein, the Defendants acted under color of state law

based on their positions within the Georgia Department of Corrections.

# III. JURISDICTION

33.   This action is brought pursuant to 42 U.S.C. § 1983, and this Court has

jurisdiction pursuant to 28 U.S.C. § § 1331 and 1343 (a)(3) and (4).

# IV. VENUE

34.   Venue is proper in this District and in the Rome Division under 28 U.S.C. §

1391(b)(2) because a substantial part of the violation of Nate's constitutional

rights that led to Nate's murder and the murder itself took place at Hays

State Prison, which is located in Trion, Georgia.  Hays State Prison is

situated within the district and divisional boundaries of the Northern

District of Georgia, Rome Division.

# V. OPERATIVE FACTS

## A. The Pervasive Dangerous Conditions at Hays

35.   Hays State Prison ("Hays") is a maximum security prison in Trion, Georgia.

36.   As of January 18, 2013, about half of the approximately 1,600 inmates at Hays had a "close" security classification.

37.   The Department of Corrections labels inmates as "close security" if the inmates are escape risks, have assaultive histories, are "deemed dangerous," and/or have detainers for other serious crimes.

38.   According to the Department of Corrections own rules and guidelines, close security inmates "require constant supervision by a correctional officer."

39.   In the months immediately prior to January 18, 2013, fights occurred between prisoners on a regular basis resulting in injuries requiring medical attention and hospitalization.

40.   Defendants knew that fights occurred between prisoners on a regular basis resulting in injuries requiring medical attention and hospitalization in the months immediately prior to January 18, 2013.

41.   During the months immediately preceding January 18, 2013, many prisoners were heavily armed with shanks, knives, and other weapons.

42.   As of January 18, 2013, Defendants knew that many prisoners were heavily armed with shanks, knives, and other weapons, and that the prisoners had been so armed for months.

43.   During the months immediately preceding January 18, 2013, weapons were often not confiscated from prisoners as required by standard operating procedure.

44.   As of January 18, 2013, Defendants knew that for months weapons had often not been confiscated from prisoners as required by standard operating procedure.

45.   As of January 18, 2013, there were multiple reports of stabbings and deaths at Hays in recent years.

46.   As of January 18, 2013, Defendants knew that there were multiple reports of stabbings and deaths at Hays in recent years.

47.   The rate and severity of prisoner-on-prisoner violence had worsening since 2010 through January 18, 2013.

48.   As of January 18, 2013, Defendants knew that the rate and severity of prisoner-on-prisoner violence was worsening since 2010.

49.   In the months immediately preceding January 18, 2013, Hays was understaffed, such that critical security posts were unmanned.

50.   Defendants knew that, in the months immediately preceding January 18, 2013, Hays was understaffed, such that critical security posts were unmanned.

51.   In the months immediately preceding January 18, 2013, the understaffing at Hays left prisoners with supervision and monitoring below applicable standards.

52.   Defendants knew that, in the months immediately preceding January 18, 2013, the understaffing at Hays left prisoners with supervision and monitoring below applicable standards.

53.   In the months immediately preceding January 18, 2013, inmate-on-inmate violence was facilitated by the lack of monitoring and supervision of close security inmates caused by understaffing.

54.    Defendants knew that, in the months immediately preceding January 18, 2013, inmate-on-inmate violence was facilitated by the lack of monitoring and supervision of close security inmates caused by understaffing

55.    In the months preceding January 18, 2013, prisoners routinely slept in cells to which they were not assigned.

56.    As of January 18, 2013, Defendants knew that prisoners routinely slept in cells to which they were not assigned and had done so for months.

57.    In the months immediately prior to January 18, 2013, numerous prisoners possessed contraband cell phones, which allowed prisoners to coordinate with other prisoners.

58.    As of January 18, 2013, Defendants knew that numerous prisoners possessed contraband cell phones, which allowed prisoners to coordinate with other prisoners.

59.    In the months immediately prior to January 18, 2013, gang leaders exercised control over housing assignments and were permitted to expel prisoners they no longer wanted in their dorms.

60.   As of January 18, 2013, Defendants knew that gang leaders exercised control over housing assignments.

61.   During the months leading up to January 18, 2013, Defendants had accepted gang leaders' decisions to expel prisoners that the gang leaders no longer wanted in their dorms.

62.   In the months immediately prior to January 18, 2013, prisoners were able to move undetected across the prison campus to areas in which they were not authorized to be.

63.   As of January 18, 2013, Defendants knew that prisoners were able to move undetected across the prison campus to areas in which they were not authorized to be.

64.   In the months immediately prior to January 18, 2013, the broken or easily defeated locks in Building C enabled prisoners to move undetected between the C-1 dorm where Rodrigues was housed and the C-2 dorm where Nate was to be housed.

65.   As of January 18, 2013, Defendants knew that the broken or easily defeated locks in Building C enabled prisoners to move undetected between the C-1

dorm where Rodrigues was housed and the C-2 dorm where Nate was to be housed.

66.   In the months immediately prior to January 18, 2013, corrections officers at Hays were stabbed or otherwise seriously injured on several occasions.

67.   Defendants knew that, in the months immediately prior to January 18, 2013, corrections officers at Hays were stabbed or otherwise seriously injured on several occasions.

68.   In the months immediately prior to January 18, 2013, corrections officers at Hays often remained in control rooms because they were afraid to enter prison dorms.

69.   Defendants knew that, in the months immediately prior to January 18, 2013, officers often remained in control rooms because they were afraid to enter prison dorms.

70.   In the months immediately prior to and at the time of Nate's murder, stabbings and deaths were frequently reported.

71.   Defendants knew that, in the months immediately prior to and at the time of Nate's murder, stabbings and deaths were frequently reported.

72. At the time of Nate's murder, Defendants maintained files for each prisoner.

73. At the time of Nate's murder, the files maintained by Defendants on each prisoner noted the prisoner's gang affiliation.

74. At the time of Nate's murder, Defendants knew that placing rival gang members in close, unsupervised proximity posed a significant risk of injury to the prisoners.

75. At the time of Nate's murder, Defendants knew that placing any inmates near each other when they had previously been involved in fights with knives posed a danger to the inmates.

76. At the time of Nate's murder, a significant portion of the inmate-on-inmate violence was driven by gang affiliation of the involved prisoners.

77. At the time of Nate's murder, Defendants knew that a significant portion of the inmate-on-inmate violence was driven by gang affiliation of the involved prisoners.

78. Defendants were deliberately indifferent in responding to the known security hazards at Hays, even as the level of violence escalated and numerous inmates and officers were victimized.

79.   Two of the Defendants exacerbated the breakdown in security by alerting inmates to upcoming security "shakedowns," with the goal of advancing their careers by achieving positive reviews on departmental audits.

80.   In the months immediately prior to and at the time of Nate's murder, stabbings by inmates were treated as disciplinary issues, not crimes, and were addressed, if at all, by "administrative segregation," or solitary confinement, not charges being brought.

81.   Defendants knew that, in the months immediately prior to and at the time of Nate's murder, stabbings by inmates were treated as disciplinary issues, not crimes, and were addressed, if at all, by solitary confinement, not charges being brought.

82.   Defendants' standard operating procedure was not to transfer to different prisons any inmates at Hays who stabbed other inmates.

B.  History of Known Broken Cell Door Locks at Hays

83.   Although Hays housed some of Georgia's "most challenging" offenders during the months preceding January 18, 2013, many of the cell doors at the prison did not work and had been broken for years.

84. As of January 18, 2013, Defendants knew that many prison cell doors has not worked for years.

85. The broken cell door locks at Hays put prisoners and officers in danger.

86. Defendants knew that the broken cell door locks at Hays put prisoners and officers in danger.

87. Broken cell door locks enable inmates to avoid being locked down and separated, and to move undetected across the prison campus to areas where they are not authorized to be.

88. As of January 18, 2013, Defendants knew that broken cell door locks enable inmates to avoid being locked down and separated, and to move undetected across the prison campus to areas where they are not authorized to be.

89. Prison audits from 2008, 2009, 2010, 2011, and 2012 reported that the facility's cell door locks could be easily opened, leaving prisoners to roam in and out of their cells at will.

90. As of January 18, 2013, Defendants were aware that the prison audits from 2008, 2009, 2010, 2011 and 2012, showed broken cell door locks.

91.   Despite this well-documented security hazard, Defendants neither fixed the problem with functioning locks, nor took reasonable alternative steps to control dangerous inmate movements as of January 18, 2013.

92.   Broken and defeated cell door locks were listed as a "Major/Critical Finding" on engineering audits at Hays in 2008, 2009, 2010, 2011, and 2012.

93.   The problem of broken cell locks worsened during the years preceding January 18, 2013.

94.   On August 5, 2008, an Engineering Comprehensive Audit by the GDC's North Field Engineering department found that 65 locks were "defeated" and stated that "[t]he locks need to be repaired or replaced."

95.   On November 3, 2009, an Engineering Comprehensive Audit by the GDC's North Field Engineering office discovered a "[h]igh number of locks that can be defeated."

96.   The 2009 audit further noted that "[e]ngineering has Hays on the list for a complete lock replacement."

97.   Another Engineering Comprehensive Audit conducted by the GDC's North Field Engineering office between July 19, 2010, and July 21, 2010, listed "Locks and Locking Control Panel" under "Major/Critical Findings."

98.   On July 26, 2010, the GDC's Audits and Compliance Unit sent a letter to Defendant Tatum making a finding that "Locks and Locking Control Panels can be easily opened."

99.   An Engineering Audit conducted by the GDC's North Field Engineering office between May 31, 2011, and June 2, 2011, listed "The Locks and Locking Control Panels" under "Major/Critical Findings."

100.  The 2011 Audit noted that Hays would be getting a new locking control system.

101.  Broken door locks were also well documented in incident reports, which were written by officers and reviewed by Defendants.

102.  On May 31, 2011, Officer D. Cable wrote in a Use of Force Supplemental Report that a prisoner who refused to remain in his cell attacked him: "Inmates were on lock down[.] Inmates came out of cell [and] refused to return back to cell after a direct order."

103.   A report summarizing an Engineering Comprehensive Audit that took place between September 26, 2011, and September 27, 2011, listed "DOOR LOOCKS" [sic] under "Major/Critical Findings."

104.   The September 2011 audit further stated that 119 out of 365 – or nearly one-third – of door locks tested had "problems."

105.   A "Breakdown of Lock Audit Problems Found at Hays SP" on September 27, 2011, indicated that deadlocks could be defeated for 21% of the 365 locks tested.

106.   The Executive Summary of the Comprehensive Audit, written by the Audits and Compliance Unit, and sent to Defendant Tatum on September 28, 2011, stated "Finding: Locks and Locking Controls – The locks in the inmate housing area could be easily defeated."

107.   A report summarizing an Engineering Comprehensive Audit that took place between September 10, 2012, and September 12, 2012, stated "High Number of Cell Door Locks that will not Deadlock."

108.   The 2012 report further found that of 442 locks checked, 184—*41% of the locks tested*—were able to be "defeated."

109.   Defendant Tatum prepared an "Executive Summary" on October 16, 2012, stating, "Findings: Locks and Locking Controls – High number of cell door locks were able to be defeated."

110.   Although Defendants and other GDC officials knew that this maximum security prison lacked functioning cell door locks, they were deliberately indifferent in failing to take reasonable steps to fix this problem (or to otherwise control inmate movement) even after prisoners had been killed as a direct result of security failures.

111.   It was not until February 14, 2013, that the GDC submitted a "Purchase Order" for the replacement of the locks at Hays.

112.   The purchase order acknowledged that broken locks had resulted in attacks on inmates and staff.

113.   The purchase order stated:

Hays State Prison *has had recurring problems* with the Cell Door locks in its housing units.  This situation has *severe security implications* in that *breaches of the locks have resulted in attacks on inmates and staff.*  This is a situation which must be

addressed and corrected as fast as possible and therefore

GDC has chosen to contract directly with a company to

replace the existing locks with more secure locking system.

This is considered an Emergency Purchase situation.

114.   This purchase order was submitted over four years after audits clearly revealed a

serious problem with broken locks at Hays State Prison.

C.  History of Widespread Abuse and Violence at Hays and Defendants'
Deliberate Indifference to Those Conditions

115.   In the months immediately prior to Nate's murder, Defendants knew that the

foregoing conditions posed a significant risk of harm to prisoners in violation of

clearly established law.

116.   Defendants were on notice of and subjectively aware of the foregoing critical

problems of safety, security, and violence at Hays State Prison and of the specific

risk that the prison conditions presented to Nate as demonstrated by the

following:

A.    Defendants Owens, Ward, Tatum, Hatcher, Bailey-Dean, and Clark

reviewed incident reports in which a high rate of deaths, stabbings, and

assaults was documented.

B.      These incident reports put the Defendants on notice of the serious risk of harm to and life-threatening conditions for inmates.

C.      Defendants Owens, Ward, Tatum, Hatcher, Bailey-Dean, and Clark knew that GDC internal audits found a pervasive problem of broken locks on cell doors, year after year, from approximately 2008 until 2012.

D.      Defendants knew that Hays officers had been critically injured by prisoners wielding weapons.

E.      Defendants knew that the security failures described above had contributed to the death of another prisoner on December 19, 2012.

F.      Defendants knew that the security failures described above had contributed to the death of another prisoner on or about December 26, 2012.

G.      Defendants knew that prisoners and prisoners' family members had complained about the unusually high level of violence at Hays State Prison and the safety of inmates there in the year preceding January 18, 2013.

H.      Defendants Owens and Tatum received written notice of the dangerous conditions at Hays.

I.      On February 17, 2012, the Southern Center for Human Rights (SCHR) wrote to Commissioner Owens and GDC Legal Counsel Robert Jones regarding the rising number of homicides and assaults at Hays and other GDC facilities.

J.      No response was ever sent to SCHR regarding its February 17, 2012, letter.

K.      Prior to January 18, 2013, no action was taken by Defendants regarding the conditions described in SCHR's February 17, 2012, letter.

117.   Despite this notice that conditions at the prison were intolerable and unconstitutional, the Defendants permitted security conditions at Hays to further deteriorate.

118.   Defendants failed to take reasonable steps to fix broken locks at Hays.

119.   Due to Defendants failure to take reasonable steps to fix broken locks at Hays, cell door locks in prison dormitories remained broken for years, permitting close-security inmates at this maximum-security prison to enter and exit their cells – at virtually any time of day or night – as they pleased.

120.   Defendants failed to fix the locks and failed to take other reasonable steps to control inmate movement.

121.   The Defendants knew that Hays was not adequately staffed and failed to take reasonable steps to ensure adequate staffing.

122.   At the time of Nate's murder, approximately fifteen percent of officer positions at Hays were vacant.

123.   The vacant positions meant that less than a full staff was on duty at the time of Nate's murder.

124.   Security posts were left unmanned, leaving inmates without supervision.

125.   Defendants Tatum, Hatcher and Clark continued to permit gangs to control dorm housing assignments.

126.   Defendants Tatum, Hatcher, and Clark knew that, as a matter of course, officers led newly-arrived prisoners to a dorm and told them to find an open bunk.

127.   Defendants Tatum, Hatcher, and Clark knew that gangs would determine where new arrivals slept and were permitted to expel prisoners that they did not want in their dorms.

128. Defendants Tatum, Hatcher and Clark were deliberately indifferent to the prevalence of contraband known to permeate the facility, including knives, cell phones, and drugs.

129. Defendants Tatum, Hatcher and Clark failed to ensure that prisoners found with shanks were disciplined to deter inmates from possessing deadly weapons.

130. Defendants Tatum, Hatcher and Clark failed to ensure that officers conducted adequate contraband searches.

131. Defendants Hatcher and Clark deliberately interfered with efforts by GDC tactical squads to search the prison.

132. Defendants Hatcher and Clark warned inmates about upcoming shakedowns in order to achieve positive reviews on departmental security audits.

133. Defendants Hatcher and Clark ordered correctional staff to go dorm to dorm to alert inmates to hide or dispose of contraband before tactical security squads arrived to search the prison.

134. On at least one occasion, in June 2011, Defendant Hatcher ordered a Unit Manager to tell inmates that they would get pizza and chicken if the squad did not find contraband.

135.    In so doing, Defendants Hatcher and Clark violated Georgia law and GDC policy, undermined officers' authority, and contributed to the breakdown in security that led to the deaths of Nate and three others.

136.    Despite the rising tide of violence, the Defendants still failed to fix broken locks and failed to reasonably respond to unsafe conditions that permitted the violence to occur.

137.    Despite the history of violence and inattention to safety failures, on May 29, 2012, the GDC named Hays State Prison as " Facility of the Year" —an honor bestowed partly in recognition of the low amount of contraband found after Defendants pre-warned inmates of tactical squad searches.

138.    In the six months preceding Nate's death, at least 15 men required off-site emergency medical care for serious injuries.

139.    The following incidents were documented in GDC Incident Reports written by Hays officers:

    A.      On August 20, 2011, inmate Alford Morris was murdered with a shank;

B.     On October 7, 2011, one prisoner was stabbed eight times in the head and back and was transported to the emergency room in serious condition; another prisoner was sent to the hospital with five stab wounds;

C.     On February 28, 2012, two officers were stabbed by a prisoner with a "home made sharpened weapon."   Both were rushed to the hospital via ambulance "for severe injuries."

D.     On July 27, 2012, an inmate reported he had been "tied up" in a cell and beaten.  He was transported to an offsite hospital for "abrasions and 2 puncture wounds to face, back, left hand, left leg and foot and right foot possible broken nose."

E.     On July 28, 2012, an inmate was transported to the hospital by ambulance after an officer noticed him "bleeding profusely," with "multiple lacerations and puncture wounds to head, cheeks, ear, chest, back both arms and hands."

F.     On August 10, 2012, an officer observed an inmate "bleeding from his face and head" with "abrasions contusions, lacerations and punctures to head, eye, face, chest, back and both arms."

G.   On August 18, 2012, an inmate was transported to the hospital after an assault which caused " abrasions, contusions, lacerations and punctures to head, nose, both ears, left leg and right arm."

H.   On August 19, 2012, an officer observed two inmates running " with what looked to be shanks" and saw a third inmate " stumble downstairs with blood on his back." The injured inmate had " contusions and lacerations to [his] back" and was transported to a hospital.

I.   On August 31, 2012, an officer saw " several inmates fighting with weapons" and an inmate " covered in blood with visible injuries." The inmate was taken by ambulance to the hospital with " 17 lacerations/puncture wounds to chest and back and both arms."

J.   On September 1, 2012, an officer witnessed an inmate " approach [another inmate] from behind and stab him in the back multiple times with a sharp pieces [sic] of metal." The injured inmate was transported to the hospital for " lacerations and puncture wounds to chest, sides, back and arms."

K.    On September 4, 2012, an officer observed an inmate with
       "multiple stab wounds to head, back and left arm."  The prisoner
       was sent by ambulance to the hospital.

L.    On September 9, 2012, an inmate with "blood on his clothing" approached
       an officer for help. He was transported to the hospital for "multiple
       lacerations and punctures to his chest, neck, left foot and back."

M.    On September 21, 2012, an inmate who "appeared to have been assaulted"
       asked an officer to be moved to another dorm. He had a swollen face and
       "contusions, lacerations to head, eyes, face and back."

N.    On September 25, 2012, an officer observed an inmate "standing with blood
       coming [out] of his mouth" with "contusions and lacerations to head, mouth
       and lips."

O.    On September 28, 2012, a prisoner being chased by other prisoners jumped
       off the top tier of the prison dorm, "dropped to the bottom range," and
       was stabbed by several prisoners. He was taken to an offsite hospital for "multiple
       lacerations to head, face, buttock and both hands."

P.     On September 28, 2012, an officer " noticed [an inmate] come from his room

[...] covered in blood."  The inmate was sent to the hospital for " blunt

injuries to facial [sic], head, both ears, nose and lip area."

Q.     On October 3, 2012, an officer saw an inmate " bleeding" with " visible

injuries" including " 30 lacerations/puncture wound[s] to back and legs."

R.     On October 7, 2012, a bleeding man " collapsed on the sidewalk" after being

stabbed in the chest, shoulder, and head. Prison medical staff was

summoned, and the prisoner was taken by ambulance to the hospital.

Bloodied knives were recovered from the dorm.

S.     On October 27, 2012, an inmate with a " swollen face" and " abrasions,

contusions and lacerations to head, both eyes and both arms" approached an

officer saying he had been assaulted.

T.     On October 29, 2012, an officer saw an inmate " on the ground with blood

coming from his face."  The prisoner was transported to the hospital for

" contusions and lacerations to head, ear, nose and face."

U.     On November 1, 2012, two inmates stabbed another inmate with a " 7 inch

sharp metal weapon," causing the injured inmate to sustain " lacerations to

forehead and back of head."

V.     On November 5, 2012, two inmates reported being assaulted. One had blood

on his clothes and [was] bleeding from the lip," and the other was " bleeding from

the nose."

W.     On November 20, 2012, a prisoner reported that he had been assaulted by

gang members. He was " bleeding from the nose and had a big knot on his

forehead."

X.     On November 27, 2012, a prisoner who reported that he had been assaulted

by six prisoners had " several abrasions to [the prisoner's] face and knots on the

back of his head."

Y.     On December 7, 2012, a prisoner who had been in his new dorm " for 5

minutes" approached an officer who " noticed he had been beaten badly."

The prisoner had " contusions to head, eyes, mouth and nose."

Z.     On December 8, 2012, two prisoners approached an officer, one of whom

was " badly beaten."  The man had " abrasions, lacerations and contusions to

head, nose, face, mouth, neck, back and both arms and legs" and was sent to the hospital.

AA.   On December 9, 2012, an officer witnessed a prisoner "attacking" another prisoner. The injured man was taken to the hospital due to a "laceration to left ear and top of head."

BB.   On December 10, 2012, an officer observed a prisoner coming down the stairway and "noticed his shirt was covered in blood on both shoulders." As the officer talked to the injured man, "blood started running thru [sic] his shirt on the right shoulder." He was treated for "lacerations to eyes, head, chest, top of both arms front and back."

CC.   On December 11, 2012, an inmate was hospitalized after suffering "multiple abrasions, contusions, lacerations and possible fracture to head, eyes, cheek, face, mouth and left foot."

DD.   On December 19, 2012, Derrick Stubbs was found dead in his segregation cell.  Upon information and belief, he had been assaulted in another part of the prison where locks did not work.

EE.   On December 26, 2012, one week after Mr. Stubbs's death, inmates killed fellow prisoner, Damion MacClain.

FF.   On January 3, 2013, an inmate assaulted another inmate with a sharpened piece of metal.

GG.   On January 12, 2013, a prisoner chased another prisoner and stabbed him with " a sharpened piece of metal."

140.   The foregoing history of widespread abuse put Defendants on notice of the need to correct dangerous conditions at Hays.

141.   Even after the two murders during a four week span in December of 2012, however, the Defendants failed to take reasonable steps to fix the prison's broken locks, to control inmate movement, or to otherwise address the lawlessness.

142.   Defendant Owens knew about the longstanding and pervasive problem of violence, broken cell door locks, understaffing, and serious security lapses at Hays as described in this Complaint.

143.   Despite knowing of longstanding and pervasive problem of violence, broken cell door locks, understaffing, and serious security lapses at Hays, Defendant Owens deliberately ignored the known risk of serious harm to prisoners.

144. At the time of Nate's murder, Defendant Ward was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence, understaffing, and broken locks.

145. Defendant Ward knew about the problem of broken locks on cell doors.

146. Despite knowing of the problems posed by working locks on cell doors, Defendant Ward failed to take reasonable steps to fix the problem, and failed to control inmate movement by other means.

147. Defendant Ward further knew that Hays prisoners were subject to serious risk of harm from violence as described in this Complaint, but he deliberately ignored the known risk of serious harm to prisoners.

148. At the time of Nate's murder, Defendant Tatum was on notice of the dangerous, life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken locks.

149. Defendant Tatum knew about the longstanding problem of broken locks on the cell doors.

150.   Despite knowing about the longstanding problem of broken locks on cell doors, Defendant Tatum failed to take a reasonable steps to fix the problem and failed to control intimate movement by other means.

151.   Defendant Tatum knew that Hays prisoners were subject to a serious risk of harm from violence as described in this Complaint.

152.   Defendant Tatum deliberately ignored the known serious risk of harm to prisoners.

153.   Defendant Tatum permitted gang members to control prisoner housing assignments.

154.   Defendant Tatum permitted prisoners to possess dangerous contraband.

155.   Defendant Tatum undertook the aforementioned actions and inactions deliberately and knowing that they increased the risk of harm to Nate.

156.   Defendant Tatum specifically knew of the risk of harm to Nate.

157.   At the time of Nate's murder, Defendant Hatcher was on notice of the life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks.

158.    Defendant Hatcher knew about the longstanding problem of broken locks on the cell doors.

159.    Despite knowing about the longstanding problem of broken locks on cell doors, Defendant Hatcher failed to take a reasonable steps to fix the problem and failed to control intimate movement by other means.

160.    Defendant Hatcher knew that Hays prisoners were subject to a serious risk of harm from violence as described in this Complaint.

161.    Defendant Hatcher deliberately ignored the known serious risk of harm to prisoners.

162.    Defendant Hatcher permitted gang members to control prisoner housing assignments

163.    Defendant Hatcher permitted prisoners to possess dangerous contraband.

164.    Defendant Hatcher specifically knew of the risk of harm to Nate.

165.    Defendant Hatcher ordered subordinates to warn inmates in advance of tactical squad searches.

166.    Defendant Hatcher permitted gang members to control dorm housing assignments.

167.   Defendant Hatcher allowed prisoners to possess dangerous contraband.

168.   Defendant Hatcher undertook the aforementioned actions and inactions deliberately and knowing that they increased the risk of harm to Nate.

169.   At the time of Nate's murder, Defendant Bailey-Dean was on notice of the life-threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks.

170.   Defendant Bailey-Dean knew about the longstanding problem of broken locks on cell doors, but she failed to take reasonable steps to fix the problem and failed to control inmate movement by other means.

171.   Defendant Bailey-Dean further knew that Hays prisoners were subject to a serious risk of harm from violence as set forth in this Complaint, but she deliberately ignored the known risk of serious harm to prisoners.

172.   At the time of Nate's murder, Defendant Clark was on notice of the dangerous, life threatening conditions at the prison, including the prevalence of violence and deaths, understaffing, and broken cell door locks.

173.   At the time of Nate's murder, Defendant Clark knew about the longstanding problem of broken locks on cell doors and the attendant improper inmate movement.

174.   At the time of Nate's murder, Defendant Clark he failed to take reasonable steps to fix the broken cell door locks and failed to control improper inmate movement by other means.

175.   At the time of Nate's murder, Defendant Clark further knew that Hays prisoners were subject to a serious risk of harm from violence.

176.   Defendant Clark deliberately ignored the known risk of serious harm to prisoners caused by the conditions at Hays.

177.   Defendant Clark exacerbated and encouraged the level of violence at Hays by ordering subordinates to warn inmates in advance of tactical squad searches.

178.    Defendant Clark exacerbated and encouraged the level of violence at Hays by permitting gang members to control dorm housing assignments and conduct orientation for incoming inmates.

179.   Defendant Clark exacerbated and encouraged the level of violence at Hays by allowing inmates to possess dangerous contraband.

180. At the time Defendant Souther escorted Nate to Building C on January 18, 2013, he knew that two prisoners had been murdered by other prisoners at Hays State Prison during the previous four weeks.

181. At the time Defendant Souther escorted Nate to Building C on January 18, 2013, he knew that prisoners routinely were armed with weapons, such as shanks.

182. At the time Defendant Souther escorted Nate to Building C on January 18, 2013, he knew that members of rival gangs in the prison posed an extreme danger to the safety of one another.

183. At the time Defendant Souther escorted Nate to Building C on January 18, 2013, he knew that Nate had been in administrative segregation for stabbing another prisoner.

184. At the time Defendant Souther escorted Nate to Building C on January 18, 2013, he knew that the prisoner Nate had stabbed was housed in Building C.

185. Defendant Souther was required to avoid placing prisoners in a situation where they were likely to be injured or killed.

186.  Defendant Souther failed his duty not to place Nate in a situation where Nate was likely to be injured or killed by delivering Nate into the presence of the very prisoner Nate had stabbed.

187.  Defendant Souther's actions and inactions were deliberate and undertaken knowing that they increased the risk of harm to Nate.

188.  At the time Defendant Hoglund escorted Nate to Building C on January 18, 2013, he knew that two prisoners had been murdered by other prisoners at Hays State Prison during the previous four weeks.

189.  At the time Defendant Hoglund escorted Nate to Building C on January 18, 2013, he knew that prisoners routinely were armed with weapons, such as shanks.

190.  At the time Defendant Hoglund escorted Nate to Building C on January 18, 2013, he knew that members of rival gangs in the prison posed an extreme danger to the safety of one another.

191.  At the time Defendant Hoglund escorted Nate to Building C on January 18, 2013, he knew that Nate had been in administrative segregation for stabbing another prisoner.

192.   At the time Defendant Hoglund escorted Nate to Building C on January 18, 2013, he knew that the prisoner Nate had stabbed was housed in Building C.

193.   Defendant Hoglund was required to avoid placing prisoners in a situation where they were likely to be injured or killed.

194.   Defendant Hoglund failed his duty not to place Nate in a situation where Nate was likely to be injured or killed by delivering Nate into the presence of the very prisoner Nate had stabbed.

195.   Defendant Hoglund's actions and inactions were deliberate and undertaken knowing that they increased the risk of harm to Nate.

196.   Defendants knew that, when members of one gang are injured by members of another gang, the first gang always seeks retribution against the second gang.

197.   After Nate was stabbed, the two prisoners who stabbed Nate were escorted to the Hays Prison Special Management Unit on a path away from other prisoners because the guards escorting them knew that other prisoners were armed and were likely to take revenge against the two prisoners for Nate's stabbing.

198.   The manner in which Nate's murderers were escorted to the Special Management Unit demonstrates the fact that, at the time of Nate's murder, it

was common knowledge at Hays that prisoners were armed and were likely to take revenge when they or an ally were stabbed by another inmate.

199. The manner in which Nate's murderers were escorted to the Special Management Unit demonstrates the fact that, at the time of Nate's murder, it was Defendant Hoglund's duty to escort Nate in a manner that minimized the risk of injury or death to Nate.

200. Defendants were further on notice that Rodrigues, one of the prisoners charged with killing Nate, had a history of assault, having been imprisoned due to his stabbing of another man.

201. Despite this knowledge, Defendants sent Nate to reside in the very same building as Rodrigues.

202. As of January 18, 2013, the majority of Hays inmates who were placed in administrative segregation due to the fact that he had non-fatally stabbed another inmate were not sent to a different prison, but were returned to the general population at Hays.

203. Defendants did not even consider transferring Nate to a different facility after he finished his administrative segregation punishment for stabbing Rodrigues.

### E.  The Murder of Nate Lamont Hall-Jackson

204.   In September of 2012, Nate got into an altercation with fellow Hays prisoner

Rodrigues.

205.   The altercation had its roots in a dispute over access to television.

206.   Rodrigues and other Hispanic inmates historically had been allowed to use one of

the three televisions in their C Building dormitory to watch television broadcast in

Spanish, while two other televisions were reserved for English speaking television

broadcasts.

207.   In September of 2012, the television that was used to watch Spanish speaking

broadcasts broke.

208.   Rodrigues and the other Hispanic inmates were prevented by the other prisoners

from using either of the two remaining televisions to watch Spanish speaking

broadcasts.

209.   Shortly after this dispute over the televisions in September of 2012, Nate and

Rodrigues got into a fight.

210.   Nate and Rodrigues belonged to different gangs.

211.    During the fight between Nate and Rodrigues in September of 2012, Nate

        stabbed Rodrigues, although the wound was not fatal.

212.    Stabbing another person is a crime under the laws of the State of Georgia.

213.    Nate was not charged with any crime for his stabbing of Rodrigues.

214.    Nate's stabbing of Rodrigues was not reported to the local district attorney.

215.    Nate's stabbing of Rodrigues did not result in Nate being transferred to another

        prison.

216.    Nate's stabbing of Rodrigues did not result in Rodrigues being transferred to

        another prison.

217.    Nate was punished for his stabbing of Rodrigues by Defendants by being given

        administrative segregation in the Special Management Unit ("SMU") at Hays

        and related restrictions on or about September of 2012.

218.    On January 18, 2013, Nate was released from SMU.

219.    Defendants assigned Nate to live in the C Building.

220.    After his release from SMU, Nate was escorted by Defendants Souther and

        Hoglund to the C Building.

221.   Prior to Nate's return to C Building, Defendants did not verify that Rodrigues was secured so that he could not have access to Nate.

222.   Neither Defendant Souther nor Defendant Hoglund was armed as each of them escorted Nate from SMU to C Building.

223.   At the very same time that Nate was being escorted from SMU, inmates from C Building, including Rodrigues, were finishing their supper.

224.   Inmates were given a short period to finish their supper.

225.   Once inmates finished eating, they were free to leave the cafeteria and return to C Building on their own, with the dorm doors and gates open for them to travel as they wish between the cafeteria and dorm.

226.   Inmates walked without an escort by corrections officer from the cafeteria back to C Building, a distance of more than 100 yards.

227.   At the time Rodrigues was walking back from his supper, he had two shanks on his person.

228.   Rodrigues had a "close" security classification.

229.   Rodrigues was not under constant supervision by any corrections officer as he walked back from the cafeteria.

230.    As Defendants Souther and Hoglund reached C Building with Nate, they encountered Rodrigues.

231.    Upon seeing Nate, Rodrigues and another Hispanic inmate attacked Nate.

232.    Rodrigues and the other Hispanic inmate cornered Nate into an area surrounded by a locked fence and a C Building brick wall, an area from which Nate could not escape.

233.    Rodrigues and the other Hispanic inmate had the time to stab Nate seventeen times before Hays guards sprayed them with pepper spray and stopped the attack.

234.    The unarmed Defendants Souther and Hoglund observed from nearby as Nate was stabbed.

235.    By the time that corrections officers sprayed the attacking inmates with pepper spray and got them to stop attacking Nate, Nate had been stabbed:

A.      Seven inches into the right front side of his chest;

B.      Six inches into his right side;

C.      Three inches into his left forearm;

D.      Three inches into his left upper back;

E.      Three inches into his left lower extremity;

F.  One-and-one-quarter inches into the lower part of his abdomen;

G.  One inch into the left front side of his chest; and

H.  Ten other times where the wounds were wide, but had a depth of one half-inch or less.

236.  Shortly after two inmates stopped stabbing Nate, Nate, bleeding from his wounds, was told to put his hands behind his back to be cuffed.

237.  Nate collapsed on the ground as he placed his hands behind his back.

238.  No one attempted to do CPR to Nate as he lay bleeding on the ground.

239.  Nate died of his wounds.

240.  The unconstitutionally unsafe conditions, with broken locks and freely roaming, armed inmates returning from supper, that Defendants permitted to exist at Hays enabled prisoners to convert Hays into a battle zone between warring inmates and gangs.

241.  Defendants' actions and inactions proximately caused Nate's murder, in violation of the Eighth Amendment to the United States Constitution.

242.  Plaintiff seeks damages for the murder of her husband due to the deliberate indifference of the Defendants.

# VI. COUNT I
# Violation of Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983

243.    Plaintiffs incorporate herein and re-allege, as if fully set forth herein, all factual allegations set forth above.

244.    Defendants' policies, practices, acts, and omissions placed Nathaniel Reynolds at unreasonable and foreseeable risk of serious injury and death.

245.    Defendants acted with deliberate indifference to the safety of Nathaniel Reynolds and other prisoners and officers at Hays State Prison. As a consequence, Nate was incarcerated under conditions posing a substantial risk of serious harm.

246.    Defendants' policies, practices, acts, and omissions constituted deliberate indifference to a serious risk of harm to Nathaniel Reynolds and constitute clearly-established violations of the Cruel and Unusual Punishments Clause of the Eighth Amendment, made applicable to the States through the Fourteenth Amendment to the United States Constitution.

247.   As a proximate result of Defendants' illegal and unconstitutional acts and omissions, Nathaniel Reynolds was left unprotected; was attacked; experienced grave physical, emotional, and psychological injury and pain; and died.

248.   Defendants' above-described actions were deliberate and in reckless disregard of Nathaniel Reynolds's constitutional rights.

249.   Defendants' conduct warrants an award for the wrongful death of Nathaniel Reynolds.

250.   Defendants' conduct warrants an award for the pre-death pain and suffering of Nathaniel Reynolds.

251.   In the alternative to an award for wrongful death, Defendants' conduct warrants an award of punitive damages in an amount to be determined at trial.

252.   Punitive damages are necessary to deter future Eighth Amendment violations by these Defendants and at this institution.

# VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court:

A.     Assume jurisdiction over this action;

B.     Grant Plaintiff a trial by jury of her peers;

Page 48

C.      Declare that the acts and omissions described herein violated Nathaniel

        Reynolds's rights under the Constitution and laws of the United States;

D.      Enter judgement in favor of Plaintiff and against each Defendant for all

        damages allowed by law, including, but not limited to:

        A.      The full value of the life of Nathaniel Reynolds;

        B.      The pre-death pain and suffering endured by Nathaniel Reynolds;

        C.      Funeral and burial expenses;

        D.      Nominal damages; and

        E.      Punitive damages.

E.      Award Plaintiff the costs of this lawsuit and reasonable attorneys' and expert

        fees and expenses pursuant to 42 U.S.C. § 1988(b) & (c) and as otherwise

        allowed by law; and

F.      Order such additional relief as this Court may deem just and proper.

Respectfully submitted this 20th day of October, 2014.

/s/ A. Thomas Stubbs
A. Thomas Stubbs
Georgia Bar No. 689310
*Attorney for Plaintiff Muriel Reynolds*

Law Office of A. Thomas Stubbs, LLC
125 Clairemont Avenue, Suite 515
Decatur, Ga 30030
Ph. (404) 378-3633
Fax (404) 377-8304
Email: tom@stubbslaw.com

/s/ Catherine E. Bruce
Catherine E. Bruce
Georgia Bar No. 709795
*Attorney for Plaintiff Muriel Reynolds*

Law Office of Catherine E. Bruce, LLC
125 Clairemont Avenue, Suite 515
Decatur, Ga 30030
Ph. (404) 378-3633
Fax (404) 377-8304
Email: catherine@catherinebrucelaw.com